## Case No. 11,228.

### Ex parte PLITT et al.

[2 Wall. Jr. 453.] [1]

Circuit Court, E. D. Pennsylvania. Dec. 1, 1853.

CLERK'S COMMISSIONS—COSTS—COUNSEL AND CONTINGENT FEES.

1. A clerk of the circuit courts of the United States is not, under Act Feb. 26, 1853 [10 Stat. 161], relating to clerks' fees, nor otherwise, entitled to commissions for "receiving, keeping, and paying out money," unless the fund has actually passed into the court, or through the clerk's official hand, or has been agreed to be considered as having done so. The fact that the money is subject to the decree of the court, it not being in the court's registry, is not enough to give the clerk a right to commissions.

[Cited in Leech v. Kay, 4 Fed. 73; Fagan v. Cullen, 28 Fed. 843; Thomas v. Chicago & C. S. Ry. Co., 37 Fed. 550; Easton v. Houston H. T. C. Ry. Co., 44 Fed. 721.]

2. A fund in the hands of an intestate's administrator, upon which a decree of this court has acted, or is acting, is liable to three classes of charge: 1st. The necessary expenses of ascertaining it, and reducing it into possession. 2d. A reasonable compensation for its safe keeping, and the supervision of its interests. 3d. The expenses of ascertaining the proper distributees, and making distribution among them. Accordingly, under the 1st head the court allowed a party who had claimed as next of kin (though unsuccessfully as to any part) a whole fund in an administrator's hands, the actual expenses of a foreign commission obtained by him under implied authority of the administrator, a stakeholder, to show that certain funds abroad were assets of the estate, and so increase it. And also allowed him a sum for his expenses and trouble successfully exercised in the same implied way in obtaining indemnity from the estate of a former administrator, who had committed a devastavit and died. But would allow no part of the expenses, nor any compensation for long, wearisome, and great trouble, to which he had been put in that part of his efforts which were made in his own behalf alone; and which, unlike the former ones, had not in their result enured as above mentioned to the benefit of the opposing claimants, who had been now recently and finally decreed entitled to the whole fund. Under the 3d head the court allowed another unsuccessful party claimant of the whole fund, the actual costs and expenses to which he had been put in showing the relationship of all parties to the intestate, thereby enabling the court to give what it deemed a proper direction to the fund; although this party's object in showing this relationship had been to show a state of facts which, as he supposed, and in argument contended, gave him a right to the whole fund. But the court allowed him nothing material; and, as on the former case, would allow no part of the expenses, nor any compensation for long, wearisome, and great trouble to which he had been put, in that part of his efforts which were made in his own behalf alone; and which, unlike the former ones, had not in their result enured as above mentioned to the benefit of the opposing claimants, who had been now recently and finally decreed entitled to the whole fund. Under this 3d head the court allowed the counsellor of

a special class of claimants who, by consent of another class, having, up to a certain point but no further, an interest common with this special class, and by order of court, had rendered great professional service to the whole class, before the point where the interests of the two classes diverged, a counsel fee of $6000, or three-fourths of 1 per cent. upon a fund distributable. The court considering that there was no doubt of its power where a fund is within its control, to take care of the rights of the solicitors who have claims against it, whether for their costs technically speaking, or their reasonable counsel fees; and regarding such persons in no other light than as meritorious assignees of a part interest.

[Cited in Ex parte Jaffray, Case No. 7,170; Re O'Hara, Id. 10,465; Re New York Mail Steam-Ship Co., Id. 10,208; Trustees v. Greenough, 105 U. S. 535.]

[Cited in Stewart v. Flowers, 44 Miss. 513.]

3. The court makes some extra-judicial remarks, in reply to argument at the bar, upon what are called contingent fees, or fees stipulated beforehand to be paid on the successful result of the litigation. It speaks of the practice of making such stipulations as not to be generally commended, exposing honourable men to misapprehension and illiberal remark, and giving the apparent sanction of their example to conduct which they would be among the foremost to reprehend. And though the court remarked that such contracts might sometimes be necessary, in a community such as that of Pennsylvania had been, and perhaps as it is yet; and that where they have been made in abundant good faith, uberrima fide, without suppression or reserve of fact, or exaggeration of apprehended difficulties, or undue influence of any sort or degree; and where the compensation bargained for is absolutely just and fair, so that the transaction is characterized throughout by "all good fidelity to the client;" the court would hold them valid; yet they remarked further that it was almost unnecessary to say, that such contracts, as they could scarcely be excepted from the general rule, which denounces as suspicious the dealings of fiduciaries with those under their protection, must undergo the most exact and jealous scrutiny before they can expect the judicial ratification.

4. A case before the court being an exceptional and very peculiar case, where there was a large fund left by a bachelor, with doubtful domicil and of uncertain sanity, without any near relatives, but vast numbers of remote ones, to his "heir-at-law or lawful heir," where the claimants were very numerous, poor, scattered about the world, having fractional interests, and quite unable to pay counsel for maintaining what after a quarter of a century's hard litigation, and without any compromise, was decided to be their just rights; and where the court knew the whole extent of the counsel's labours, and knew also the rate of commission, and the whole extent of the gross sum received by them; such a case was regarded by the court as illustrating very fairly the occasional policy of such contracts. And in the case of a fund of $800,000 or thereabouts, the court did not consider as unconscionable a stipulation for a contingent compensation of 7½ per cent.; it being by the terms of the contract divisible between three counsel, the suit having been pending for 25 years; having required an enormous mass of testimony from England as well as here; having been argued three or four times in this court, and as many times before the supreme court at Washington; and having been finally adjudged there only by an equally divided court.

[Cited in Re O'Hara, Case No. 10,465.]

Two cases in previous parts of these Reports (White v. Brown [Case No. 17,538], and Aspden's Estate [Id. 589]) give an account of

---

[1] [Reported by John William Wallace, Esq.]

Mathias Aspden and his estate. This man was a bachelor of selfish, secluded, and ridiculous habits, and indeed of rather doubtful sanity, who, born in Pennsylvania prior to the Revolution, left the country on that event, and after an unsettlea and strange life, died in London, in 1824, leaving a large personal estate to his "heir-at-law," or "lawful heir." A variety of circumstances connected with a very doubtful place of domicil, and with questions of fact and of law, made it quite a difficult matter to decide who, under these terms, was to take the estate. One John Aspden, of Lancashire, England, claimed it in 1828, and after a long and able argument on the whole law and merits, before this court, when the late Justices Baldwin and Hopkinson sat here, the court "had no hesitation in expressing its most decided opinion that he was entitled to the whole estate by the fixed rules of law;" and to him accordingly the whole estate was decreed to go. From this decree the case was taken to the supreme court of the United States, where, in January, 1835, without any opinion on the general law or merits, the decree was reversed, and the case remanded for further proceedings. because there was no allegation in the pleadings as to the place of the testator's domicil; a matter which, when the case was below, the counsel on both sides and the court, had considered as either sufficiently alleged or of no importance. Harrison v. Nixon, 9 Pet. [34 U. S.] 483, and [Poole v. Nixon] Id. Append. 770. In the meantime another John Aspden, to wit, John Aspden, of London, had appeared, claiming to be the true heir. Both these parties claimed the estate against one another, and they both claimed it against a large number of persons, heirs by the Pennsylvania statute law. These heirs, too, being divided into two classes, some coming ex parte paterna and others ex parte materna, at a later stage of the case claimed against one another, as until they had disposed of these persons they did jointly against the heirs real and pretended at common law. The claim of the heirs ex parte paterna was to all the estate, while the heirs ex parte materna claimed to share it with them in the rates of 32 parts to 3. With a few exceptions nearly all these half-blood parties were poor, common and rather ignorant people, including old women and children. They were scattered over the whole country; most of them were unknown to each other prior to this suit, and after they became acquainted by it, were bound together by nothing in common, but the cohesive power of one interest. New claimants, too, were constantly turning up, having been fished out by somebody who had proved to their satisfaction a relationship with Aspden. But even this bond of a common interest in a large pile of money, pressed unequally upon these parties. A few took a very active part. Others took an inert part: some would take no part at all.

In the earlier history of the case the late Mr. B. Tilghman and Mr. Newbold were the principal counsel of these last mentioned—the half-blood or statutory heirs. But there was a host of other counsel of all grades of character and importance, or of no character and no importance, hanging on the skirts of the case, and representing some small interest in it just sufficient to warrant an appearance in the court room. Some parties had no counsel; and some counsel, if they had any parties, took very little pains to represent them. All the counsel, of course, could not argue the case at Washington; and after an appeal there in 1833, Mr. B. Tilghman and Mr. Newbold were designated at a meeting of several principal and some inferior counsel, to take care of the case at Washington; it being understood that a third counsel, who practised habitually in the supreme court there, should be taken into it, in that city. A commission of 7½ per cent. contingent on the amount to be recovered, was—the witness could not say, agreed on—but was "named" as a compensation to these three counsel, who it was understood "would be rendering a general benefit" to both sides of the half-blood. And Mr. Newbold, before going to Washington did obtain agreements in writing from some of the parties in this form, st.: "We do hereby agree, each for himself, to pay J. L. Newbold seven and a half per centum, on the amount that shall be recovered for us out of the estate of Mathias Aspden, deceased, when the same shall be received, for prosecuting our claims upon said estate before the supreme court of the United States, in the case of Packer v. Nixon, now pending before said court, and do hereby constitute him our attorney for said purpose." Mr. Newbold did not expect to claim for himself this amount, but expected that all interested would sign similar papers, and that the amount would be divided into three equal parts, 2½ to Mr. Tilghman, 2½ to himself, and 2½ to the third counsel at Washington. Messrs. Newbold and Tilghman now proceeded to Washington, where they called on the Honourable Daniel Webster, Esquire, at his residence on the morning that the case was to be argued, and a short time only before the court met: and begged his professional assistance in the case. They told him what had been agreed upon. And speaking of professional compensation, Mr. Webster asked whether they could not get something as they went along—"Enough, at least," as he pleasantly asked, "enough, at least, gentlemen, to nib the pen?" Mr. Newbold told him that it was out of the question to expect any money now from the parties, most of whom were too poor, and others too doubtful of success to risk any money in fees. Mr. Webster assenting, as one witness "understood," to these terms, went with the counsel to the supreme court where the case was almost immediately called. Mr. Newbold stating it, and Mr. Webster taking notes. On

the second day's argument, one of the judges in an obiter way apparently, asked counsel if there was any averment of domicil in the pleadings, to which Mr. Newbold replied negatively. The matter was not further alluded to by the court. But after the adjournment on that day, Mr. Webster remarked to his colleagues that he thought there was "much significance" in that question which the court had asked about the averment of domicil: and after the consultation with them that evening, he himself moved the court on the following morning to suspend the argument and send the case back to amend the pleadings. A day was fixed to argue this point and it was argued by Mr. Webster's colleagues, though not by him; he being engaged elsewhere: and after argument on the other side, and a warm opinion of dissent from Justice Baldwin, the court did reverse the decree and send it back as Mr. Webster had moved. The report of the case as given by the supreme court reporter, does not refer to the matter as having been suggested at all by the court; stating simply ([Harrison v. Nixon] 9 Pet. [34 U. S.] 494) that: "At a subsequent day of the term, when the cause came on for argument upon the merits, a question was presented by Mr. Webster, who, with Mr. Tilghman and Mr. Newbold, was the counsel for the appellants; whether the bill taken by itself, or in connexion with the answer, contained sufficient matter upon which the court could proceed, and finally dispose of the cause. It was submitted, that the bill contains no averment of the actual domicil of the testator, at the time he made his will, or at any intermediate period, before, or at his death. The court directed this question to be argued, before the argument should proceed on the merits." As soon as the court ordered the argument on his motion, Mr. Webster said to his colleagues: "I will take no part in this. You, gentlemen, will." "He seemed," said the testimony, "to think that there could be no doubt about the result. He thought the court would send the case back for want of that averment." His colleagues made no objection when he said that he would take no part in the argument of the motion. There was no evidence that he was ever afterwards applied to, or took any part in the cause. And as he had been expected to act only at Washington, the question which—after the 1st argument there and the 2nd one hereafter mentioned—arose between the two classes of half-blood, for both of whom he had been engaged, was suggested as a reason why he might not have felt at liberty to do so. It was a reason why other counsel similarly situated did not. There was no evidence that Mr. Webster had ever made any stipulations of any kind, with any body, about his fees and it was certain that he never either asked or received any thing. The case, as is hereafter stated, was decided in this court in favour of the parties for whom he had acted

some months before his death in the fall of 1852; and a difficulty in the supreme court which prevented at least any reversal of that decree was known in the spring of 1852; a considerable time before it also. He had neither made any record of his own about his fee, nor preserved any from other counsel; though Mr. Newbold had many for himself and his colleague, Mr. Read. Neither Mr. Webster's family, nor his testamentary executor had ever had from him the least intimation of his claim of any fee in the case. The executor derived his first knowledge of the possibility of right from a friend of Mr. Webster's to whom Mr. Josiah Randall, who had been engaged on the other side, had communicated it; and in consequence of this information, apparently, the matter was now presented. The executor of Mr. Webster here represented by Mr. Randall did not ask to have the matter rested on any agreement for contingent compensation; but that the court "would order such an allowance to be made in compensation for Mr. Webster's services as should seem fair and equitable." It appeared that although Mr. Webster had never preferred any claim of any sort on any fund, yet in discussion among counsel, Mr. Newbold, who had received his fees based on the contingent arrangement, had said that as Mr. Webster had been spoken to, and was an eminent man, he ought to receive a complimentary fee; and that if no one else would pay it he, Mr. Newbold, would pay $1000 out of his own fee. So far as concerns the claim preferred in behalf of Mr. Webster.

After this reversal at Washington already spoken of, for want of an averment of domicil, and the remission for further proceedings, the case, of course, came back here. But in the mean time the former justices, Baldwin and Hopkinson, had departed this life, and new judges, st. the present judges Grier and Kane were now upon the bench. The whole matter came of course before them. The first thing which they did was to order an issue for trial by a jury to settle the place of Aspden's domicil: and that the parties "should respectively designate three counsel on each side by whom the said trial should be opened and argued." At this stage of the case the interest of the half-blood or statutory heirs—whether coming paternally or from the mother's side—was still a common one. They were both seeking to establish a Pennsylvania domicil, and so weaken the case of all persons who might be heir by the common law of England, and who were seeking to establish an English domicil, and so give to the "heir at law" the whole estate by making the term "heir at law," synonymous with "heir by the common law of England."

In pursuance of the order a little above mentioned, Mr. B. Tilghman, Mr. Read, and Mr. H. D. Gilpin, were designated by the Pennsylvania statutory heirs as the counsel by whom this question of domicil should be

"opened and argued" on their behalf. The opening fell to Mr. Gilpin. The evidence of domicil—some exhibition of which the reader will get by reference to the case of White v. Brown, already reported—was entirely documentary. It was enormously voluminous, extremely detailed, uncommonly discrepant: and from the absurdity of the principal character in it, old Aspden—a mere zany—positively disgusting to any study of intelligence. To this huge pile of record evidence, Mr. Gilpin had given a most attentive and pains-taking study. He had diligently hunted up from its extent and from its corners, everything which could bear upon the case; and picking it out from the disorderly congeries of an immense paper book, had put it all together in a neat, arranged, and lucid narrative. The result of the whole was, that he presented his own case in its best aspect, and presented the opposite case with all the strength in which it was possible to present it, and yet keep it throughout, strictly subordinate to his own. The opening occupied several days, and was very full. Admitted principles of law were brought in to bear on the case as thus presented, and the jury, understanding what they did understand, thought they understood every thing; and pretty much decided the case, when they had heard it stated by one side. Having been a good deal exhausted with the exercise of a long continued attention, they would hardly attend again to the supplemental kind of opening which Mr. Gilpin had made necessary for the other side; nor to the attempt of that side to show that this opening, which appeared to present a genuine and entire case, was in truth the effect of skilful collocations, of selected points of view, and of illusive casts of light; and that the pieces of the puzzle which—arranged by the adjustment of painful ingenuity—produced a figure of one aspect, could, by another process of less pains, and as much truth, be as well arranged to present a figure exactly the reverse. This opening gained, or was very instrumental in gaining, the verdict of a Pennsylvania domicil; and that domicil in truth gained the whole cause; for the domicil being settled to be in Pennsylvania, the new judges decreed exactly opposite to the former ones, and that the estate should not go to the heir by the common law of England, whether he were John Aspden, of London, or John Aspden, of Lancashire, but should go to the heir (which they held to be a nomen collectivum) by the statute law of Pennsylvania; the heirs of the half-blood already mentioned. Then sprung up, unexpectedly, a second and new question between this class of heirs; that division of them which came ex parte paterna, claiming, on certain grounds, the whole of the estate, to which, in an earlier stage of the case, and before the point was supposed to be one which would arise, the court had strongly intimated they were entitled; and the heirs

ex parte paterna claiming to share $32/35$ of it with them. Mr. Gilpin, who had been originally retained by the maternal heirs alone, now fell back to his original and more defined position, and maintained, both in this court and at Washington, with great labour of argument, against Mr. Read, who, having been retained by the maternal heirs alone, sided now with them—the claim of the paternal heirs to the whole $35/35$. But, as the result proved, that claim was not allowed either there or here; those heirs having got but $3/35$.

From the decree of the circuit court here, which first made this decree, an appeal was taken to Washington. The case was there elaborately argued in May, 1852, by Mr. J. Randall, in behalf of one Jackson, M. D., who had been appointed in this country administrator de bonis non of John Aspden, of Lancashire, one of the persons who had claimed to represent the heir by the common law of England; and the court suspending its opinion in an unusual way, "it reached the counsel of Dr. Jackson, that the court were embarrassed by the suggestion, that there was a material point that had not been taken by any of the counsel in the argument of the cause." The recollection of Mr. Randall, who was one of Dr. Jackson's counsel, and was here his witness,[2] was, "that this fact was stated by one or more of the letter writers from Washington, in the public newspapers." He was likewise informed that Mr. Reverdy Johnson and Mr. Berrien had both made the same statement, with the remark, that it was extraordinary that so many Philadelphia lawyers had been arguing a cause, and had neglected to touch upon the real point of the case. Mr. Randall "examined the various aspects of the case with as much sagacity as he could, and came to the conclusion that the point omitted was, that after the death of Mr. Nixon there was no legal representative of Mathias Aspden recognised by the laws of England, and that it would be very important that Dr. Jackson should obtain letters of administration in London, and be substituted in the place that Mr. Nixon occupied at the time of his death." He "consulted with Mr. Hirst, who had been counsel in a collateral question in the argument," and Mr. Hirst agreed in this opinion of Mr. Randall's. Mr. Randall had taken "a great deal of pains to ascertain whether these surmises were correct or not," though, of course, he "had no correspondence or communication with any one of the judges on the subject," but he "left this country under a firm belief that the information was correct;" though he was never able afterwards to find it so.

---

[2] No objection was taken under the rule 4 of this court, relating to attorney and counsel, which says, "No attorney shall be accepted as security for costs, nor as bail of any kind, nor to testify in favour of his client, except as to matters which are provable by the affidavit of a party."

Dr. Jackson, who was a medical professor in a university at Philadelphia, very reluctantly acceded to this proposition of going abroad; spoke of the injury which would be done to his profession by his absence, and said that nothing but an imperative sense of duty would induce him. Mr. Randall urged him to go, and promised to accompany him, which he did. They sailed on the 15th of June, 1852, and returned some time in October. "After Dr. Jackson arrived in London, he was put," said Mr. Randall, "to much inconvenience; compelled to remain a longer time than we expected; and I think more than a month after myself. I left him behind. The solicitor selected required him to be in London on the 8th of October, and he sailed some days after that, I think on the 13th. His request was finally refused; at least he never did receive letters. The course of medical lectures, of which he was professor, had commenced before he returned, to the detriment of himself and of the university, as was alleged by his brother professors." After Dr. Jackson arrived in London, in the end of June, being told that nothing could be done until September or October, he made a continental tour to Havre, Paris, Brussels, Aix la Chapelle, Cologne, Wiesbaden, Frankfort, Baden Baden, Strasburgh to Paris, Boulogne, &c., to London; the expenses at which places, on the continent, Mr. Randall testified was about half the expense of remaining in London; that place, so far as he knew, being the dearest, and Baden Baden, where Dr. Jackson remained two days, the cheapest. The whole expenses of his journey abroad, were $1697.70. Dr. Jackson had previously to setting out to get these letters of administration in London, been appointed by the orphans' court at Philadelphia administrator de bonis non of John Aspden, of Lancashire, already mentioned, and had given bond with sureties in the large sum of $670,000; and "from the time of his appointment zealously and laboriously attended to its duties." Consultations with counsel were frequent, and Dr. Jackson put aside all professional and other avocations to attend to these meetings. He attended upon the counsel when the argument was prepared, and he also, at the request of his counsel, attended at Washington at the argument before the supreme court, in May, 1852. The counsel on all sides who attended Washington at that time, had by consent of each other obtained an order of court to take out of the fund a certain sum for their expenses in attending that argument. No provision was made for Dr. Jackson, who, Mr. Randall testified, "had received nothing from any source to reimburse himself the sums he had expended, nor any compensation for the services he had rendered," whatever they were. There was no doubt that Dr. Jackson had devoted a great deal of time to following up the case; and had made himself master of all that it became him to know.

The case having been argued a second time at Washington, in December, 1852, by Mr. Read and others, including Mr. Gilpin, on appeal from the decree above mentioned of the new judges, that decree, by an equally divided court, (see Brown v. Aspden, 14 How. [55 U. S.] 25; and Aspden's Estate [Case No. 589]) was affirmed; and the fund amounting to near $800,000, was now to be distributed. It had never been "paid into court," nor agreed to be considered as paid into court, though under orders of the court the administrator had frequently paid expenses incident to the suit. After the death of old Aspden's surviving executor, who had devastated part of it, it passed to an administrator de bonis non, the defendant in the original case, who still held it, and had been paid for holding it, by an allowance in the orphans' court of the state where he had settled his administration account. Submitting himself constantly to the orders of this court, he had frequently paid out certain comparatively small sums under those orders certified by the clerk; these being for expenses of printing, &c., &c., and for payment by consent of certain principal counsel on both sides, to them both for their expenses in being at Washington to argue the case there. For convenience, apparently, these sums had sometimes passed through the clerk's hands.

An act of congress, passed on the 26th of February, 1853, under the head of "Clerks' Fees," provides that there shall be allowed to the clerk of the circuit court "for receiving, keeping and paying out money in pursuance of the requirements of any statute or order of court, one-per cent. on the amount so received, kept, and paid." A former fee bill was to a similar but not more favourable effect.

The two Aspdens (against both of whom, irrespective of the question which was between themselves, of true heirship at the common law, the case had been decided) had expended a good deal of money and had had a great deal of trouble about the case. From 1826, when John of London first made his claim, till May, 1852, soon after which time it was decided against him, that John had expended $7226.10 for travelling and lodging expenses, counsel and clerk fees, printers' bills, and very moderate allowance to himself for trouble and loss of time through this term. A small part of his expenses, $1750, but a good deal of his trouble had been caused by a breach of trust in the sole surviving executor of old Aspden, the testator, and by exertions to obtain a lien in one of the state courts at Philadelphia against the executor's estate; which lien he did obtain, thereby saving a loss of many thousand dollars to old Aspden's estate. Another item of his expenses was the cost of a commission, $92.50, at an early date; the effect of which

was to prove the testator's personal property in England. John of Lancashire had expended $2502.85, generally on accounts similar to those of John of London's, except in regard to services against the defaulting executor, and in regard to proving the testator's property. John of Lancashire had laid out no money on these accounts, but he had laid out about $1197.42, for costs and expenses connected with commissions abroad, which showed the whole relationship of the respective claimants, of all sides, in the case, to old Aspden, the common testator. He had never made to himself any allowance for time or trouble.

The bulk, thirty-two thirty-fifths, of this large fund was paid over to the counsel of the largest representatives of the half blood, Mr. Read, Mr. Newbold, and Mr. B. Tilghman, who retained among themselves, and independently of any reference to Mr. Webster, the 7½ p. c. originally named; but a portion, about $60,000, of the distributable fund, was reserved for further order; and several claims, the subject of this case, were now made upon it.

1st. George Plitt, Esquire, clerk of this court, represented by Mr. R. P. Kane, for the payment to him out of the fund, of 1 p. c. upon the whole distributable fund.

2d. John Aspden, of London, represented by Mr. M'Laughlin, for a bill of $7226.10, for his expenses and trouble as just above stated.

3rd. John Aspden, of Lancashire, represented by Mr. Markland, a bill of $2502.85, with interest, for his expenses, as also above stated.

4th. Dr. Jackson, represented by Mr. Randall, a claim of quantum meruit, "for care and trouble as administrator of John Aspden, of Lancashire, heir at·common law of testator, and for his costs and charges in the performance of the duties of that office," of which claim his bill for $1697.70, the expenses of his European tour, was one item.

5th. The testamentary executor of the late Honorable Daniel Webster, Esquire, represented by Mr. Randall, for "such an allowance, in compensation for his services, as should seem fair and equitable."

6th. H. D. Gilpin, Esquire, represented by Mr. G. M. Dallas, for three-fourths of 1 per cent., or about $6000, "for services rendered by him on behalf of all the next of kin, under an order of the court, and with the consent of all representing the said next of kin."

Against these Claims. 1st. The clerk's. The money was never paid into court. And though the administrator has paid out parts of it, under orders of the court, which orders may have been certified by the clerk, it has been no otherwise "in court," than that it has been in contest and waiting a final decree; nor does the decree operate upon it, further than a decree would operate on a piece of land for a conveyance, of which a bill had been filed in equity. No one would say that this land was "in court." The clerk has never either "received, kept or paid" out this money. This has been done by the administrator, and the administrator has been paid for it. One decimation of the fund is enough.

2nd and 3rd. The claim of the two Aspdens may be disposed of together. They claimed an enormous fund. The game was well worth the contest. They pursued it, and with fair grounds of hope. But it has eluded them. It has been finally determined that they had no right whatever to the money which they claimed; that the property belonged entirely to other persons. Why shall these other persons be made to pay a large sum for having been disturbed and delayed for a quarter of a century in the enjoyment of their own property? property now decided to have been always and rightly theirs, and to have been by these present applicants, the Aspdens, all the while unlawfully withheld from them? The Aspdens have paid for a chance. They purchased a lottery ticket and drew a blank. What right have they to call on him who drew a prize, to make good the cost of their ticket?

4th. Dr. Jackson's claim stands much on the same foot. The fact that he was a medical professor, whose professional receipts have been greatly injured by his absence in Europe, was a sufficient reason why he should not have applied for this administration at all. From the nature of his professional duties, he was certain to be unable to attend to it without injury to them. The supposition under which he went abroad, had no foundation in fact at all; and none even in imagination, beyond impertinent and loose rumours about private opinions of the supreme court, which it was nobody's right to know. He, too, embarked in a lottery; and has no right to complain that he has been paying for tickets that drew no prize.

5th. The case of Mr. Webster was never thought of by him, or by his executors; and comes into court only because it has been invited. If he ever meant, at any time, to make a claim, it is clear that he himself abandoned it. While everybody else was keeping records and making charges, he kept no record and made no charges. The main controversy about Aspden's estate was disposed of in his life time, but a claim was never mentioned by Mr. Webster, nor heard of by those nearest and dearest to him. His son, his executors knew nothing of it; though these last, when told of it, could, of course, do no less than make it known. Under these circumstances, it is not just to his memory—a memory ever dear to his friends and to this country—to present a demand so unlike any ever presented by himself.

6th. Mr. Gilpin had his special clients ex parte paterna, who paid him. What he did, enured, it is true, to the benefit of the claimants ex parte materna; but that was no merit of his. It has so enured, beyond his expectations and contrary to his design. Mr. Gilpin battled with the heir-at-law, because he himself claimed the whole fund for his

own special clients. And after he had secured it from that heir to the heirs general on both sides, as he had to do before he claimed it for his own clients, instead of taking his proper share of $3/35$, he sought to take it all. He abandoned the common field when he had vanquished an enemy, who, though common, was proper also; and who was fought, not because he was common, but because he was proper. Having turned all his arms against his allies, he now from them asks remuneration. Remuneration for what? For this only, that in spite of his ablest and earnest efforts to take these $33/35$ from them, they have been strong enough to keep them to themselves. And here, too, was a chance. The claimants ex parte paterna were few. The whole of $35/35$ of such a fund, was indeed a splendid prize. It was worth the winning, and worth the contest. The contest has been fought, but the prize has not been won. After a long, hard and honourable contest, others are in possession of it, and in possession rightful. It is theirs, and as is now decided, always has been theirs. In such a case resignation is becoming: and afterthoughts should have no place.

Mr. M'Call, who was with several others, counsel in opposing these claims, briefly but very ably, and with much dignity, argued in addition, 1st. That the taking of contingent fees, however reasonable it might appear in any particular case, was in its general effects so liable to abuse and so injurious to the character of the profession, that it ought not to receive the deliberate sanction of the court, which was now for the first time in Pennsylvania invoked; and 2d. That the agreements for compensation in the case at bar were matters entirely between counsel and client, not amounting to assignments of the fund, nor giving any lien on it: and therefore the court had no jurisdiction to award their payment out of the fund.

In Favour of the Claims. The clerk has in some instances actually distributed the fund which was paid into his hands, though not perhaps technically into court. No doubt, in those cases, he might have obtained a formal order of payment into court. The claim of such officers to their commission should not be held down to technical observance, or they will be tempted to resort to forms and to delay (the result of them), to secure the commission meant to be allowed to substance.

2nd and 3rd. The claim of the two Aspdens is more tenable. Here is an enormous fund in chancery, left by a fool—a zany—under peculiar facts and a will of most difficult interpretation. The claimants are scattered over the earth and seas. They are most of them poor. The rightful claimant is perhaps the poorest of all, and wholly unable to show his right. Will the court give the fund to any claimant able to make a primâ facie case? Or will it make some effort to ascertain the rightful party? It wishes to inform itself; and unless the cost of information is paid by the fund, it will be paid by nobody, and the court will not be rightly informed at all. Such a fractional part of the fund is most properly employed in giving the residue a legal and moral direction. A fund is constantly so used in the payment of auditors, advertisements, masters, jurors, &c.

4th. Dr. Jackson acted by the advice and more than the advice of counsel all through. He was urged, importuned to acquire the administration in London, and went abroad animated by nothing but an imperative sense of duty, and in the performance of an act urged upon him by his counsel. He had no sinister design. He asks nothing but remuneration for actual disbursements.

5th. The claim of Mr. Webster's executors is eminently fair. Mr. Webster gained this whole case for these parties who now refuse a cent to his estate. His wonderful mind in an instant saw the immense meaning which lay in a casual inquiry of one of the judges, if indeed it was an inquiry of any judge; for the reporter states that the point of domicil was first raised by Mr. Webster himself. Whether or not, he took it up and followed it out. Some of the ablest counsel of Philadelphia had gone through the case before Judge Baldwin, without once raising that point. Yet who denies that this is the point on which the whole case has finally turned? Mr. Webster did not argue the case at Washington. And why? No doubt, in making his motion, in a few words, in one or two simple propositions—words and propositions which no man could have proposed but himself—he came like a sledge-hammer upon what, beneath his stroke, was first destined to give way. While other men were in doubt, he saw in one instant the inclination of the court, and he saw that inclination was decision. "He seemed," says the testimony, "to think there could be no doubt about the result," and therefore, he said, "I will take no part in this: you, gentlemen, will." He had done the work, and he left others, either on his own side or on the opposite, to undo it, if they could. He could sleep "in spite of thunder." Admit that, as an honourable barrister, he never made a contract about his fees; that he took no writings, enforced no signatures, nor presented any claim. Is that an argument here before an honourable court, the guardians of its officers and of its suitors both alike, and now having distribution of the fund and awarding it to all entitled? It is the highest tribute to Mr. Webster's purity and honour, the proudest testimony to his professional and personal character—his character as a barrister and a gentleman—that he did make no entries; that he did leave no records; did never present any claim for professional services; and that he never dreamt of looking at such matters in the spirit of an attorney or a broker. The application now brought forward in behalf of his executors does not profess to rest upon contract. Contract for contingent

compensation is repudiated. Mr. Webster's testamentary executor asks "for such an allowance, in compensation for his services, as should seem fair and equitable." Can the fees of counsel ever rest on purer, more honourable grounds?

6th. Mr. Gilpin's labour was immense. By the mere force of orderly and lucid statement, he gained a point before the jury which was referred to the jury alone. As a matter of fact, the heirs ex parte materna have gained vast benefit from his labours. All the counsel could not argue the point. Mr. Gilpin was appointed to argue it for all parties. He did argue it, and argued it successfully. He was entitled to compensation then, if it could have been foreseen that the statute heirs would finally gain the case away from the heir at common law. Up to a certain point the interest of the heirs ex parte paterna and those ex parte materna was common. Each class of heirs understood that; and each was willing to pay for a service in fact, no matter with what ulterior motive rendered. Each, after a certain point, was willing to trust to its own ability against each other. Both, before that point, were afraid of a common enemy.

It will not do in this country yet to argue against contingent compensations. In the interior country, especially, our people are poor. Our counsel anywhere, are not much richer. Certainly, the court must keep a close eye upon its officers, and upon the least intimation of rapacity must probe the matter to its origin. It would of course set aside any unconscionable contract.[3] This case is free from imputation. Though for a quarter of a century there has been a huge fund, a mere prize for contest, no compromise has ever been made, in one instance, where, under an order of court, the expenses of counsel at Washington, on all sides, were allowed. The money has never gone into counsel's hands at all, nor by any consent among them. The bulk of the fund remains as it was. The case has been one of a long, hard, honest fight; "a regular pounding-match;" and the whole fund, after twenty-

five years of fruitless and uncompensated toil to the counsel of the other side, now goes into the hands of the statute heirs. The application is made to the court. The whole case is familiar to it. The extent, merits, and result of Mr. Gilpin's services are known to all, and especially known to the court.

We need not speak at all of contracts for contingent fees generally. Our remarks would be extraneous to Mr. Gilpin's case. His claim is upon a professional quantum meruit "for services rendered by him on behalf of all the next of kin, under an order of the court and with the consent of all representing the said next of kin." He could not have declined to render these services without having committed a contempt of the court. The court will see that his successful toil is liberally recompensed.

KANE, District Judge. The estate which has been the subject of litigation, remains in the hands of the administrator. There has been no order that the fund, or the residue of it, should be paid into court. It is therefore, as it has been, a fund subject to our decree, but not in our registry; within the judicial control, but over which that control is yet to be exercised. It is not moneys "deposited" in court, or moneys "received, kept, and to be paid out" by the clerk. That officer has, therefore, no claim upon it, under either the former or the present fee bill, of the sort which has been contended for, except so far as he may appear, upon future taxation, to have disbursed any portions of it under the occasional orders of the court.

Over and above the fees of office, this fund is subject to three classes of charge:

1st. The necessary expenses of ascertaining it, and reducing it into possession.

2nd. A reasonable compensation for its safe keeping, and the supervision of its interests.

3rd. The expenses of ascertaining the proper distributees, and making distribution among them.

All of these would be included by the practice of the English chancery, in the general designation of expenses, or of costs taxable between solicitor and client; and as such, would in a case like this be allowed against the fund. See the orders in Stanton v. Hatfield, 1 Keen, 358, and in Gaunt v. Taylor, 2 Hare, 413, and the opinion of the Vice-Chancellor in Thompson v. Cooper, 2 Colly. 90.

In the first of these classes, we are disposed to include certain costs and expenses, which were paid by John Aspden, of London, for a commission to England, and in the early proceedings in the state court at Philadelphia against the executor; and we add to these the sum of one thousand dollars, as a compensation for his vigilant and effective service in securing a very large amount of money to the estate, and in lieu of all expenses incurred by him in and about the same.

---

[3] Mr. Justice Grier, who was present at the argument, though not at the delivery of the court's opinion, here observed that these contingent fees were "very delicate affairs." They were not allowed at all in England, and had given rise in our country to great abuse in some instances. Still, perhaps, they would have to be tolerated awhile longer, especially in the country. This much he would say, that if the action of the court were needed, it would disregard such a contract, and allow counsel what, under the circumstances, the court deemed fair. On the other hand, he wished to be also understood, that the court would take care of counsel who, in this country, often suffered from the stinginess of clients. If a client would not pay his counsel properly, and the court could in any way get hold of the funds, it would order an allowance to him. And the court would not suffer clients to receive money themselves, or to compromise a case "outside and over the counsel's heads," without first making proper compensation for their service and capacity.

The administrator de bonis non is the only person before us whose claim would have a place in the second class. He has, however, been satisfied for his expenses, care and trouble, by an allowance in the orphans' court, where he has settled his administration account.

Among the expenses of ascertaining the proper distributees of this fund, or, more properly speaking, as among the costs to be taxed under the decree, we allow the several charges incurred by John Aspden, of Lancashire, in and about the execution of commissions to examine witnesses abroad.

The claim of Dr. Jackson seems to us plainly outside of all the classes we have indicated. His action did not contribute to the increase of the fund, or aid the court in determining the mode of its distribution. He was the administrator in this country of one of the suitors for the estate, and he sought unsuccessfully to become administrator in England also. He failed to obtain a decree in favour of the interests which he represented; and we do not see that he has any other rights. against the fund than the other parties who shared his failure.

The claims for professional services rendered in this cause by Mr. Webster and Mr. Gilpin, refer themselves to the third class of which we have spoken. We have no doubt of the power of the court, where a fund is within its control, as in the case before us, to take care of the rights of the solicitors who have claims against it, whether for their costs, technically speaking, or their reasonable counsel fees. We can regard them in no other light than as meritorious assignees of a part interest; and they are so regarded in the English chancery. White v. Pearce, 7 Hare, 278. The principle and the rule are fully established in that country by the cases which have been already cited; and these are sustained in the United States by the New York adjudications, both at common law and in equity (Pinder v. Morris, 3 Caines, 165; Bradt v. Koon, 4 Cow. 416; Talcott v. Bronson, 4 Paige, 501); and they are recognised by the supreme court of Pennsylvania (Balsbaugh v. Frazer, 7 Har. [19 Pa. St.] 98).

Whether it was originally wise to invest the due compensation of counsel with the incidents of a legal demand, and whether the dignity, and with it the usefulness of the profession, might not have been better secured by leaving its members to a merely honourary recourse, has divided the opinions of intelligent and honest thinkers. But the question is now, and has long been a merely speculative one in Pennsylvania; and our courts have either to remodel the law, or to enforce it as it stands, by admitting the lawyer to sue for his quantum meruit.

So, too, of the practice, which has obtained to a considerable extent, of stipulating beforehand for professional fees, contingent on the result of the litigation. It is not a practice to be generally commended, exposing honourable men not unfrequently to misapprehension and illiberal remark, and giving the apparent sanction of their example to conduct, which they would be among the foremost to reprehend. Such contracts may sometimes be necessary in a community such as that of Pennsylvania has been, and perhaps as it is yet; and where they have been made in abundant good faith—uberrima fide —without suppression or reserve of fact, or exaggeration of apprehended difficulties, or undue influence of any sort or degree; and where the compensation bargained for is absolutely just and fair, so that the transaction is characterized throughout by "all good fidelity to the client;" the court will hold such contracts to be valid. But it is unnecessary to say, that such contracts, as they can scarcely be excepted from the general rule, which denounces as suspicious the dealings of fiduciaries with those under their protection, must undergo the most exact and jealous scrutiny before they can expect the judicial ratification.

These general observations have been invited by some portions of the argument; they have no purposed application to anything presented by the facts before us. Indeed, the case may be regarded as illustrating very fairly the occasional policy of these contracts. But a small proportion of those, whose rights in the Aspden estate have been finally affirmed by the courts, were in circumstances to support the long and costly litigation which those rights have undergone; and the compensation which they engaged to pay in case of success, though large in the aggregate, was altogether moderate, because contingent on the result. The gentlemen who have devoted, for so many years, and through so many discouragements, their talents, mature learning, and untiring energy, to the prosecution of this case through all its chances, have confessedly earned all that they have received.

Included in the per centage which was payable to them, was the agreed compensation for the services of Mr. Webster. But he was not directly a party to the agreement by which the clients bound themselves to the payment. His agreement was with the original counsel, and they were to pay him out of the fee they were themselves to receive. Whether his compensation was to be measured by one standard or another, whether it was specific or contingent as to amount, to be modified by reference to the extent and character of his services, or to be dependent solely on the amount recovered, we are relieved from inquiring. The clients have complied with the terms of their engagement; and the per centage which they engaged for, and to which Mr. Webster looked, has been paid out of the fund with the consent of all parties, to the gentlemen who were entitled, in the first instance, at least, to receive it.

In this the claim of Mr. Webster's execu-

tors differs from that which has been presented by Mr. Gilpin. The parties who were before us asserting title as the next of kin, were themselves divided in interest and right, and were represented by different and numerous counsel. In the progress of the cause, after it had come back to us from the supreme court, we directed a feigned issue to be tried at law between the asserted heir-at-law on the one side, and all those who claimed to be the next of kin, as a single class, on the other. It became necessary, of course, that a limited number of counsel should be elected to represent the two great parties to this issue, and an order of court was made to that effect. Mr. Gilpin, who had been before retained by one of the parties, having in one aspect a minor interest, and in another an interest adverse to the rest, was chosen at a meeting of all the counsel, as one of the persons to try the cause for the next of kin. The selection was ratified by the court. The effort of Mr. Gilpin in opening the case, evinced the highest degree of professional ability and research: it is scarcely too much to say that it gained the cause.

The gentlemen who were associated with him on the law side of the court, having been originally retained by parties who were ultimately successful in the secondary contest in equity, have been compensated for their services. With Mr. Gilpin the case is different. Those whom he immediately represented, though victorious in the feigned issue like the rest of the next of kin, were defeated in the contest which followed, and have recovered a comparatively trifling amount. He has not felt himself authorized, under the circumstances, to accept compensation from his original clients alone, for the services which he rendered to them in common with all the rest, under the order of the court and the appointment of their counsel.

The parties, against whom his claim would be sustained at law, as for services rendered at their "instance," or at least with their "consent" (Balsbaugh v. Frazer, 7 Har. [19 Pa. St.] 95) are numerous and scattered. Some of them have appeared before us by their counsel, to recognize the fitness and justice of the demand asserted for Mr. Gilpin: others, admitting its propriety in general terms, have questioned the manner in which it should be assessed among the several parties: others, again, are unrepresented, or decline consenting to its payment from the fund. Now, it is the familiar rule of courts of equity, where a suit has been instituted and carried on for the benefit of many, that all who come in to avail themselves of the decree shall bear their just proportion of the charges. Thompson v. Cooper, 2 Colly. 90, which was a creditor's suit against an administration; Rogers v. Ross, 4 Johns. Ch. 608, which was a controversy like the present, growing out of the ambiguous language of a will: and Mason v. Cod-

wise, 6 Johns. Ch. 297, 301, where Chancellor Kent, by the terms of his decretal order, declared that he who comes in under the general decree, "is admitted upon the condition of being contributory to the plaintiff for his proportion of the expense of the suit."

It appears to the court, that if any case can occur, in which this rule should be enforced by holding the fund liable for the remuneration of the solicitor, it is this: where a gentleman has been chosen, by the concurrence of all the parties in interest before this court, to render service for them all; that service to be rendered in a trial at law directed by this court, and by counsel, who, by the further order of this court, were to be specially assigned for its performance;—where the service has been rendered so ably, and with such important results to all;—and where, from the number, position, and relations of the parties, it has been from the first, and yet is impossible that they should unite in tendering to him a just honorary recompense. And it appears to us also, that where, from the character of the controversy, seven and a half per cent. has been esteemed by the parties themselves a fair compensation to the rest of the counsel who succeeded, the charge of three-quarters of one per cent. should not be deemed a more than adequate return for the successful labours of Mr. Gilpin. Decree accordingly.